IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICHARD D. POLLEY and
LINDA RADFORD,

     Plaintiffs

vs.                                                         No. 11 CV 861 KG/RHS

XUREX, INC. F/K/A/
XUREX NANO-COATINGS CORP.,

     Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court upon Defendant Xurex, Inc.'s (Xurex) Second

Motion for Summary Judgment and Brief in Support of the Second Motion for Summary

Judgment, filed November 20, 2013.  (Docs. 68 and 67).  Plaintiffs filed a response, and

Defendant filed a reply.  (Docs. 77 and 83).  On April 18, 2014, the Court held a hearing on

Defendant's Second Motion for Summary Judgment and Plaintiffs' Supplemental Motion for

Summary Judgment.  (Doc. 87).  Present at the hearing were Robert M. St. John, counsel for

Plaintiffs, and Paul Fish and Kevin Pierce, counsel for Defendant.  Having considered

Defendant's Second Motion for Summary Judgment, the corresponding briefs, the evidence of

record, and the argument of counsel at the April 18, 2014, hearing, the Court denies Defendant's

Second Motion for Summary Judgment.

*I. Background*

     A. *Plaintiffs' Complaint to Recover Upon Promissory Note (Complaint) and Xurex's Second Motion for Summary Judgment*

This case involves a contract dispute between Plaintiffs and Xurex.  On February 22,

2008, Plaintiff Richard Polley (Polley) and Robert Bishop, on behalf of Xurex Nano-Coating

Corp. (XNC), executed three documents: a [Separation] Agreement, a Promissory Note, and a Stock Certificate Escrow Agreement (Escrow Agreement) (collectively, Separation Documents). On September 27, 2011, Plaintiffs filed the Complaint against Xurex, XNC's successor company, containing a single count to enforce the Promissory Note.[1]  (Doc. 1).  Polley claims that Xurex breached the Promissory Note by failing to make required payments on the Promissory Note from October 1, 2009, to present.  Pursuant to an acceleration clause in the Promissory Note, Plaintiffs are requesting that Xurex pay the entire amount due on the Promissory Note: a principal sum of $2,496,225.39; accrued interest from October 1, 2009, through September 26, 2011, in the sum of $198,331.00; and interest after September 26, 2011, accruing daily in the amount of $273.56.  *Id.* at 3.  Xurex now moves for the Court to declare that the Promissory Note is void or voidable pursuant to a Florida statute, Fla. Stat. Ann. Section 607.0821, describing requirements for any transaction between a corporation and an interested director.

    *B.  Summary of Material Facts*

        *1. Events leading to the execution of the Separation Documents*

XNC was incorporated in Florida on March 3, 2005.  (Doc. 84) at 2.  Polley and Bo Gimvang were the co-founders of XNC.[2]  *Id.*  XNC was in the business of developing and selling protective coatings derived from technology developed by Gimvang.  *Id.*  Until at least June

---

[1] In its first motion for summary judgment, Xurex argued that it was not liable for actions of XNC.  *See* (Doc. 34).  The Court denied, without prejudice, Xurex's motion because Xurex failed to address three of the four grounds for imposing successor liability in Florida, and, therefore, failed to carry its initial burden of demonstrating a *prima facie* case of entitlement to judgment as a matter of law.  Xurex has not filed a subsequent motion for summary judgment based on its liability for the actions of XNC.  Therefore, the Court will proceed as though Xurex is liable for XNC's obligations, as described in the Separation Documents.

[2] Plaintiff Linda Radford is the former wife of Polley who acquired an interest in the Promissory Note that is at issue in this litigation.  (Doc. 1) at 1.

2007, Gimvang and Polley were the sole members of the Board of Directors of XNC. (Doc. 50-1) at 4 (depo. at 28). Both co-founders consented to the issuance of twenty-one million shares of XNC stock to Polley, roughly a 33.6% ownership of XNC. *Id.* at 7 (depo. at 42). From 2005 until November 2007, Polley was president of XNC; from November 2007, until he left XNC in February 2008, Polley was the CEO of XNC. (Doc. 67-1) at 1.

In or about September or October 2007, Robert Bishop, at the time the Chairman of the XNC BOD and XNC CEO, told Gimvang that "they needed to get rid of" Polley. (Doc. 50-1) at 6 (depo. at 38-39); *see also* (Doc. 50-2) at 4. Bishop also told Gimvang about discussions involving buying out Polley's XNC shares for $3 million.[3] *Id.* After hearing of the potential buyout, Gimvang felt the $3 million figure was a fair price to pay for Polley's shares because "we thought it would be worth a lot more in the future." *Id.* at 52.

On November 15, 2007, the XNC BOD held a board meeting and appointed Bishop president, Gimvang executive vice-president, Polley CEO, and Dennis Kennedy treasurer. (Doc. 56) at 16-17. On December 18, 2007, XNC's attorney, Curt Creely, sent Bishop a memorandum in response to a request from XNC to analyze potential issues with XNC's issuance of stock. (Doc. 55) at 8. Creely suggested that "the best course of action for [XNC] at this time is to undertake a corporate reorganization under which all the stock in [XNC] would be exchanged for stock in a new corporation, with [XNC] becoming a subsidiary of the new corporation." *Id.*

In late 2007, XNC management raised issues with Polley regarding alleged acts of misconduct. (Doc. 35-3) at 1. In response, at the end of 2007 and in January 2008, Gimvang and Kennedy allege that Polley made numerous threats against XNC, including to "essentially destroy XNC unless [it] came to terms acceptable to him;" to sue XNC if XNC did not resolve

---

[3] It is not clear from the evidence who was involved in the discussions.

3

Polley's situation to his liking; and to take XNC's technology "off-shore."  *Id.*; (Doc. 35-3) at 2; (Doc. 55) at 2.  On January 2, 2008, Bishop, Gimvang, and Kennedy made a telephone call to Polley and told him that he was no longer part of XNC. [4]  (Doc. 77-2) at 3 (depo. at 93).  According to Polley, Bishop stated that XNC had "prepared a separation package that we feel is very, very good, fair to both parties."  (Doc. 77-2) at 5 (depo. at 156).

On January 11, 2008, Creely mailed Polley two copies of a proposed separation agreement (Proposed Separation Agreement) by which XNC sought to terminate Polley's relationship with XNC.  (Doc. 50-2) at 11 - 18.  In the transmittal letter, Creely asked Polley to sign both copies of the Proposed Separation Agreement and return them, or if Polley had an attorney, have the attorney talk with Creely.  *Id.* at 10.  Polley retained an attorney, Philip Schwartz, to negotiate the terms of the Proposed Separation Agreement.  Meanwhile, following the December 18, 2007, advice from Creely, Xurex was incorporated in Delaware on January 16, 2008.  (Doc. 51-2).

Between January 11, 2008, and February 22, 2008, Creely and Schwartz negotiated the terms of the Separation Documents, modifying numerous terms of the Proposed Separation Documents and adding terms.  One of the items specifically discussed during negotiations was whether, and to what extent, Polley embezzled money from XNC.  *See*, *e.g.*, (Doc. 50-2) at 19-23.  On February 1, 2008, Creely wrote Schwartz stating that XNC was expressing "great concern … that this process is not moving to closure quickly enough, and the delay is having an adverse effect on the company's plan for addressing the issues in its capital structure and raising additional capital."  (Doc. 50-2) at 20.

---

[4] Despite the telephone call, Polley continued to hold the title of CEO of XNC and Chairman of the XNC Board of Directors, and collect a salary as such. (Doc. 77-2) at 6 (depo. at 173).

On February 28, 2008, the parties agreed to a final version of the Separation Documents. (Doc. 35-3) at 5.  Pursuant to the Separation Agreement and Promissory Note, XNC agreed to pay Polley $3 million for Polley's resignation from XNC and his twenty-one million shares, among other things.  *Id.*  At the time the Separation Documents were signed, XNC had over 100 stock holders who paid between one and two dollars per share of XNC.  *See* Transcript of Hearing (Tr.), taken April 18, 2014, at 37.[5]  On April 16, 2008, the XNC Board of Directors approved a reorganization plan whereby all shareholders were offered the opportunity to exchange their shares in XNC for shares of Xurex.[6]  (Doc. 84) at 3.  The reorganization plan contemplated that XNC's business would thereafter be conducted primarily through Xurex.  *Id.*

On July 1, 2008, when the first payment was due upon the Promissory Note and continuing through the payment due on July 1, 2009, Xurex made each of the required payments upon the Promissory Note.  (Doc. 1) at 3.  Xurex, however, failed to make the payment due upon the Promissory Note for October 1, 2009, and has failed to make every payment thereafter.  *Id.*  On June 17, 2011, Polley wrote Xurex making a demand for payment for all amounts due and owing upon the Promissory Note.  *Id.*  Xurex did not meet Plaintiffs' demand, so Plaintiffs filed this lawsuit.

### 2. The Separation Documents

#### a. The Separation Agreement (Doc. 35-3) at 5 - 15

Polley and Bishop, on behalf of XNC, signed the Separation Agreement on February 22, 2008.  Pursuant to the terms of the Separation Agreement, Polley was to resign as an employee and director of XNC and relinquish his twenty-one million XNC shares, all in exchange for $3

---

[5] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[6] Neither XNC nor Xurex exchanged the twenty-one million XNC shares previously owned by Polley for Xurex shares.  (Tr.) at 40.

million.  *Id.* at 5.  XNC was to pay the $3 million as follows: an initial payment of $200,000, followed by quarterly installments of $70,000.  *Id.* at 1.  XNC's obligation to pay the outstanding portion of the $3 million was the subject of the Promissory Note.  *Id.*  As security for the payment on the Promissory Note, XNC and Polley were required to place Polley's twenty-one million XNC shares into escrow pursuant to the Escrow Agreement.  *Id.* at 2.

The Separation Agreement also contains five "Restrictive Covenants as to Polley."  *Id.* at 10-11.  Pursuant to the restrictive covenants, Polley agreed not to: (1) disclose any of XNC's confidential information; (2) compete with XNC for two years; (3) hire or attempt to hire any XNC employee or XNC independent contractor for two years; (4) solicit or encourage any person, firm, corporation, or other business who are customers of XNC to cease doing business, to not start doing business, or to decrease their level of business with XNC; and (5) disparage XNC. *Id.*

Additionally, the Separation Agreement contains releases of claims by XNC and by Polley.  *Id.* at 6 - 8.  Polley released XNC "from any and all claims, demands, rights, actions, suits, proceedings, liabilities, obligations and causes of action of any kind and nature whatsoever."  *Id.* at 6.  XNC released Polley from all claims of any kind and nature whatsoever, known or unknown, "that the Company had, now has or hereafter may possibly have based on, … acts or omissions to act of any nature and kind whatsoever … that occurred … prior to the Effective Date of this Agreement."  *Id.*

The February 28, 2008, Separation Agreement and the January 11, 2008, Proposed Separation Agreement are substantively the same except for the addition of the release of claims by XNC.  The portions that remain essentially unchanged include: Polley's termination of

employment; the purchase price and payment schedule for Polley's twenty-one million XNC

shares; the release of all claims by Polley; and the eight restrictive covenants as to Polley.

### b.   Promissory Note (Doc. 1-1)

Pursuant to the Separation Agreement, on February 22, 2008, Bishop, on behalf of XNC,

and Polley signed the Promissory Note.  The Promissory note was executed in the principal sum

of $2.8 million.  The first payment on the Promissory Note was due on July 1, 2008, in the

amount of $70,000.00 plus accrued interest.  *Id.* at 1.  Beginning on October 1, 2008, and

continuing on the first business day of each quarter thereafter, XNC agreed to pay thirty-nine

equal quarterly payments of $84,880.05.  *Id.*  The Promissory Note contains an acceleration

clause providing that Polley may declare the amount due payable in full if, among other things,

XNC failed to pay any amount when due or within five days after the payment date.  *Id.*  The

Promissory Note states that the laws of Florida shall govern its interpretation and enforcement.

*Id.* at 2.

### c.   Escrow Agreement (Doc. 50-3)

Under the terms of the Escrow Agreement, on February 28, 2008, Polley and XNC

placed Polley's twenty-one million XNC shares in escrow with the law firm of Foley & Lardner

as escrow agents.  Foley & Lardner is still holding Polley's XNC shares in escrow.  (Doc. 58-2).

## II. Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to a material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  When

applying this standard, the Court examines the factual record and reasonable inferences

therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics

Intl, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving

party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

*III. Discussion*

Xurex requests that the Court declare the Promissory Note void or voidable pursuant to Fla. Stat. Ann. §607.0821. Section 607.0821 provides:

Director Conflicts of Interest

No contract or other transaction between a corporation and one or more of its directors or any other corporation, firm, association, or entity in which one or more of its directors are directors or officers or are financially interested shall be either void or voidable because of such relationship or interest, because such director or directors are present at the meeting of the board of directors or a committee thereof which authorizes, approves, or ratifies such contract or transaction, or because his or her or their votes are counted for such purpose, if:

(a) The fact of such relationship or interest is disclosed or known to the board of directors or committee which authorizes, approves, or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors; [or]

(b) The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve, or ratify such contract or transaction by vote or written consent; or,

(c) The contract or transaction is fair and reasonable as to the corporation at the time it is authorized by the board, a committee, or the shareholders.

8

Therefore, a contract involving an interested director that does not meet any of the enumerated exceptions articulated in Subsections (a) – (c) is void or voidable.  Put another way, if Polley is either not an interested director or meets any of the enumerated exceptions in Subsections (a)-(c), Section 607.0821 does not render the Separation Agreement and Promissory Note void or voidable, as demonstrated by the following flow chart:



Xurex contends that, (1) Polley was an interested director on February 22, 2008; (2) neither the XNC Board of Directors nor XNC's stockholders approved the Separation Documents, and (3) the Separation Agreement and Promissory Note are not fair and 'reasonable as to XNC because, (a) the price was not fair, (b) XNC gave up significant claims against Polley, and (c) Polley did not deal fairly.  Plaintiffs respond that, (1) Polley was no longer an interested director after the January 2, 2008, telephone call from Bishop, Gimvang, and Kennedy; (2) XNC's Board of Director's approved the Separation

Documents; and (3) the Separation Agreement and Promissory Note are fair and reasonable

to XNC because XNC initiated the negotiations including offering the $3 million buyout,

and Polley gave up his XNC shares, resigned, complied with the restrictive covenants, and

gave up potential claims against XNC.  The Court will first address whether the execution of

the Separation Agreement and Promissory Note was fair and reasonable as to XNC under

Section 607.0832(c) with the assumption that Polley was an interested director on February

22, 2008.  Because the Court finds that the transaction meets this requirement, it will not address

the other Subsections in Section 607.0832.

The Court finds no Florida case law interpreting the fairness and reasonableness standard

in Section 607.0832(c).  The Court, therefore, will look to Delaware case law for guidance.[7] *See*

*Foreclosure FreeSearch, Inc. v. Sullivan*, 12 So. 3d 771, 778 (Fla. Dist. Ct. App. 2009) ("We

rely with confidence upon Delaware law to construe Florida corporate law.  The Florida courts

have relied upon Delaware corporate law to establish their own corporate doctrines.").

Regarding the fairness and reasonableness of a transaction involving an interested

director, the Delaware Supreme Court has explained that

> directors are required to demonstrate both their utmost good faith and the most
> scrupulous inherent fairness of transactions in which they possess a financial,
> business or other personal interest which does not devolve upon the corporation or
> all stockholders generally.  When faced with such divided loyalties, directors have
> the burden of establishing the entire fairness of the transaction to survive careful
> scrutiny by the courts.

*Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) (internal citation

omitted).  "The entire fairness standard has two parts: fair dealing and fair price." *Americas*

*Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012) (internal citations and quotation

---

[7] Delaware has a statute, 8 Del. Code. Ann. § 144 (a), which is identical to Fla. Stat. Ann.
§607.0821.

marks omitted). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* "Although the entire fairness standard has two components, the entire fairness analysis is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.* at 1244. Evidence of fair dealing "has significant probative value to demonstrate the fairness of the price obtained. The paramount consideration, however, is whether the price was a fair one." *Id.*

Construed in the light most favorable to Plaintiffs, the evidence regarding the dealings of the parties shows that XNC initiated and largely controlled the execution of the Separation Documents. On January 11, 2008, Creely, XNC's attorney, commenced the negotiations by sending Polley the Proposed Separation Agreement containing the $3 million proposed buyout. There is nothing in the record showing that Polley engaged in negotiations about leaving the company, selling his stock, or a price for his stock prior to January 11, 2008. Both parties to the Separation Documents were represented by counsel, Polley by Schwartz and XNC by Creely. For the next six weeks, Creely and Schwartz negotiated terms of the Separation Documents, including discussions about potential claims that XNC might have against Polley for embezzlement. Both sides, however, agreed to a release of claims by XNC. Except for the addition of the release of claims by XNC, the parties made only minor changes between the Proposed Separation Agreement and the Separation Agreement. Importantly, the following parts of the Separation Agreement remained substantially unchanged from the Proposed Separation

Agreement: Polley's termination of employment; the purchase price and payment schedule for Polley's twenty-one million XNC shares; the release of all claims by Polley; and the eight restrictive covenants as to Polley.  On February 22, 2008, Polley and Bishop, who was acting on behalf of XNC, signed the Separation Documents.

Additionally, the evidence regarding the price of the Separation Documents, viewed in the light most favorable to Plaintiff, shows that around February 28, 2008, XNC shareholders paid between one and two dollars per share of XNC stock.  Based on this amount per share, Polley's twenty-one million XNC shares, if valid, potentially were worth between $21 million and $42 million dollars.[8]  Additionally, Bishop testified that he believed that Polley's shares would be worth much greater than $3 million.  Finally, the value to XNC of Polley's resignation, compliance with the eight restrictive covenants, and release of claims was considerable.

Based on this evidence, a reasonable jury could conclude that the timing of the Separation Documents, the fact that XNC initiated the negotiations, and that each side was represented by attorneys indicates fair dealings surrounding the execution of the Separation Documents. A reasonable jury could also find that the price XNC paid for Polley's XNC stock, along with his resignation, compliance with the restrictive covenants, and release of claims was a fair one.  Thus, a reasonable jury could, analyzing all aspects of the transaction as a whole, determine that the Separation Agreement and Promissory Note were "fair and reasonable" as  to XNC at the time they were signed.  Plaintiffs, therefore, have put forth evidence that raises a genuine issue of material fact regarding whether the Separation Documents

---

[8] In its response to Plaintiffs' Supplemental Motion for Summary Judgment, Xurex raises issues involving the validity of XNC's issuance of Polley's twenty-one million shares.  However, Xurex does not fully argue this issue in its Second Motion for Summary Judgment, and the Court will not address it fully in this Memorandum Opinion and Order.

meet the requirements of Fla. Stat. Ann. §607.0821. Consequently, Xurex is not entitled to summary judgment on Plaintiffs' Complaint.

 IT IS ORDERED that Xurex's Second Motion for Summary Judgment (Doc. 68) is denied.

_____
UNITED STATES DISTRICT JUDGE