IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICHARD D. POLLEY and
LINDA RADFORD,

     Plaintiffs

vs.                                                             No. 11 CV 861 KG/RHS

XUREX, INC. F/K/A/
XUREX NANO-COATINGS CORP.,

     Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Plaintiffs' Supplemental Motion for Summary Judgment and Supplemental Memorandum in Support.  (Docs. 87 and 88).  Defendant Xurex filed a response, and Plaintiffs filed a reply.  (Docs. 93 and 94).  On April 18, 2014, the Court held a hearing on Plaintiffs' Supplemental Motion for Summary Judgment and Defendant's Second Motion for Summary Judgment.  (Doc. 68).  Present at the hearing were Robert M. St. John, counsel for Plaintiffs, and Paul Fish and Kevin Pierce, counsel for Defendant.  Having considered Plaintiffs' Supplemental Motion for Summary Judgment, the corresponding briefs, the evidence of record, and the argument of counsel at the April 18, 2014, hearing, the Court grants in part Plaintiffs' Supplemental Motion for Summary Judgment.

*I. Background*

    *A.  Plaintiffs' Complaint to Recover Upon Promissory Note (Complaint), Xurex's First Amended Answer to Complaint to Recover Upon Promissory Note and Counterclaim, and Plaintiffs' Supplemental Motion for Summary Judgment*

This case involves a contract dispute between Plaintiffs and Xurex.  On February 22, 2008, Plaintiff Richard Polley (Polley) and Robert Bishop, on behalf of Xurex Nano-Coating

Corp. (XNC), executed three documents: a [Separation] Agreement, a Promissory Note, and a Stock Certificate Escrow Agreement (Escrow Agreement) (collectively, Separation Documents). The Separation Documents required Polley, in exchange for $3 million, to resign from XNC and relinquish twenty-one million XNC shares issued by XNC to Polley, among other things.  On September 27, 2011, Plaintiffs filed the Complaint against Xurex, XNC's successor company, containing a single count to enforce the Promissory Note.  (Doc. 1).  Polley claims that Xurex breached the Promissory Note by failing to make required payments on the Promissory Note from October 1, 2009, to present.  Pursuant to an acceleration clause in the Promissory Note, Plaintiffs are requesting that Xurex pay the entire amount due on the Promissory Note: a principal sum of $2,496,225.39; accrued interest from October 1, 2009, through September 26, 2011, in the sum of $198,331.00; and interest after September 26, 2011, accruing daily in the amount of $273.56.  *Id.* at 3.

On March 31, 2012, Xurex filed its First Amended Answer and Counterclaim.  (Doc. 27). Xurex asserts five affirmative defenses: First Affirmative Defense, stating that there was "no consideration" for the Promissory Note; Second Affirmative Defense, stating that there "is a failure of consideration" for the Promissory Note; Third Affirmative Defense, stating that the Promissory Note was obtained by Polley using duress and is void and unenforceable; Fourth Affirmative Defense, stating that the Promissory Note was obtained in violation of the fiduciary duties owed by Polley; and Fifth Affirmative Defense, stating the Promissory Note is void and unenforceable because the Promissory Note grossly exceeded the value of Polley's XNC shares and was signed by Bishop without authorization from the XNC Board of Directors (XNC BOD). Xurex also asserts four counterclaims against Plaintiffs: Count I, seeking declaratory judgment that XNC did not validly issue Polley's twenty-one million XNC shares; Count II, seeking

declaratory judgment that the Separation Agreement and Promissory Note are void because Polley provided no consideration for them and Bishop signed them under duress and without authority; Count III, seeking judgment against Polley for embezzlement; and Count IV, seeking punitive damages from Polley for intentionally, willfully, wantonly, and with total disregard for XNC or its shareholders executing the Separation Documents and embezzling money.  On March 30, 2012, Judge Armijo ruled in a Memorandum Opinion and Order that Counterclaim Counts I and II were properly classified as affirmative defenses and redesignated them as such.  *See* (Doc. 85) at 1.  The Court, therefore, will refer to them as the Sixth and Seventh Affirmative Defenses. Plaintiffs now move for summary judgment on Affirmative Defenses I and II, Counterclaim Counts III and IV, and Xurex's First, Second, Third, and Fifth Affirmative Defenses.[1]

    B.  *Summary of Material Facts*

       1.  *Events leading to the execution of the Separation Documents*

XNC was incorporated in Florida on March 3, 2005.  (Doc. 84) at 2.  Polley and Bo Gimvang were the co-founders of XNC.[2]  *Id.*  XNC was in the business of developing and selling protective coatings derived from technology developed by Gimvang.  *Id.*  Gimvang's part in the business "was as the chemist who invented the technology."  (Doc. 50-1) at 2 (depo. at 18). Polley's task was to raise money to start the company and to run the company.  *Id.* at 4 (depo at

---

[1] In their original motion for summary judgment, Plaintiffs argued for summary judgment on Xurex's Counterclaim Counts I-IV. *See* (Doc. 49).  The Court denied Plaintiffs' motion, without prejudice, because Plaintiffs provided inadequate analysis and legal authority and, therefore, failed their initial burden as summary judgment movants. *See* (Doc. 85).  The Court presumes that Plaintiffs filed their Supplemental Motion for Summary Judgment in response to the Court's ruling on their initial motion for summary judgment.

[2] Plaintiff Linda Radford is the former wife of Polley who acquired an interest in the Promissory Note that is at issue in this litigation.  (Doc. 1) at 1.

26-27).  Until at least June 2007, Gimvang and Polley were the sole members of the XNC BOD.

(Doc. 50-1) at 4 (depo. at 28).

On October 23, 2005, both co-founders voted at an XNC BOD meeting to issue twenty-

one million shares of XNC stock to Polley, roughly a 33.6% ownership of XNC.  *Id.* at 7 (depo.

at 42); (Doc. 56) at 13-14.  The minutes from the October 23, 2005, XNC BOD meeting do not

indicate what consideration Polley gave for his XNC shares nor do they reflect that the XNC

BOD found that the consideration received by XNC from Polley for the shares was adequate.

(Doc. 56) at 13-14.  At that time, Polley and Gimvang did not have written employment

contracts with XNC.  (Doc. 50-1) at 11 (depo. at 94).

From 2005 until November 2007, Polley was president of XNC; from November 2007,

until he left XNC in February 2008, Polley was the CEO of XNC.  (Doc. 67-1) at 1.  XNC's By-

Laws gave XNC's president the power to execute and deliver documents in the name of XNC

"when authorized" by the XNC BOD.[3]  (Doc. 57) at 2.   In or about September or October 2007,

Robert Bishop, at the time the Chairman of the XNC BOD and XNC CEO, told Gimvang that

"they needed to get rid of" Polley.  (Doc. 50-1) at 6 (depo. at 38-39); *see also* (Doc. 50-2) at 4.

Bishop also told Gimvang about discussions involving buying out Polley's XNC shares for $3

million.[4]  *Id.*  After hearing of the potential buyout, Gimvang felt the $3 million figure was a fair

price to pay for Polley's shares because "we thought it would be worth a lot more in the future."

*Id.* at 52.

_____

[3] Plaintiffs dispute that the XNC By-Laws were properly adopted because the minutes of the
XNC BOD meeting during which the By-Laws were adopted and the By-Laws themselves were
only signed by Robert Kennedy as secretary; however, Kennedy was not elected as secretary
until after the meeting in which the By-Laws were adopted.  *See* (Doc. 78-6) at 2; (Doc. 57) at 8.

[4] It is not clear from the evidence who was involved in the discussions.

On November 15, 2007, the XNC BOD held a board meeting and appointed Bishop president, Gimvang executive vice-president, Polley CEO, and Dennis Kennedy treasurer.  (Doc. 56) at 16-17.  On December 18, 2007, XNC's attorney, Curt Creely, sent Bishop a memorandum in response to a request from XNC to analyze potential issues with XNC's issuance of stock. (Doc. 55) at 8.  Creely suggested that "the best course of action for [XNC] at this time is to undertake a corporate reorganization under which all the stock in [XNC] would be exchanged for stock in a new corporation, with [XNC] becoming a subsidiary of the new corporation."  *Id.*

In late 2007, XNC management raised issues with Polley regarding alleged acts of misconduct by him.  (Doc. 35-3) at 1.  In response, at the end of 2007 and in January 2008, Gimvang and Kennedy allege that Polley made numerous threats against XNC, including to "essentially destroy XNC unless [it] came to terms acceptable to him;" to sue XNC if XNC did not resolve Polley's situation to his liking; and to take XNC's technology "off-shore."  *Id.*; (Doc. 35-3) at 2; (Doc. 55) at 2.  On January 2, 2008, Bishop, Gimvang, and Kennedy made a telephone call to Polley and told him that he was no longer part of XNC.[5]  (Doc. 77-2) at 3 (depo. at 93).  According to Polley, Bishop stated that XNC had "prepared a separation package that we feel is very, very good, fair to both parties."  (Doc. 77-2) at 5 (depo. at 156).

On January 11, 2008, Creely mailed Polley two copies of a proposed separation agreement (Proposed Separation Agreement) by which XNC sought to terminate Polley's relationship with XNC.  (Doc. 50-2) at 11 - 18.  In the transmittal letter, Creely asked Polley to sign both copies of the Proposed Separation Agreement and return them, or if Polley had an attorney, have the attorney talk with Creely.  *Id.* at 10.  Polley retained an attorney, Philip Schwartz, to negotiate the terms of the Proposed Separation Agreement.  Meanwhile, following

---

[5] Despite the telephone call, Polley continued to hold the title of CEO of XNC and Chairman of the XNC BOD and collect a salary as such.  (Doc. 77-2) at 6 (depo. at 173).

the December 18, 2007, advice from Creely, Xurex was incorporated in Delaware on January 16, 2008.  (Doc. 51-2).  Bishop served as president of Xurex and Gimvang as vice-president.  (Doc. 62-3).

Between January 11, 2008, and February 22, 2008, Creely and Schwartz negotiated the terms of the Separation Documents, modifying numerous terms of the Proposed Separation Documents and adding terms.  On February 1, 2008, Creely wrote Schwartz stating that XNC was expressing "great concern … that this process is not moving to closure quickly enough, and the delay is having an adverse effect on the company's plan for addressing the issues in its capital structure and raising additional capital."  (Doc. 50-2) at 20.

On February 28, 2008, the parties agreed to a final version of the Separation Documents. (Doc. 35-3) at 5.  Bishop as president of XNC, but without obtaining approval from the XNC BOD, signed the Separation Documents on behalf of XNC.  *Id.* at 3.  Polley was aware that Bishop did not obtain approval from the XNC BOD.  *Id.*  Pursuant to the Separation Agreement and Promissory Note, XNC agreed to pay Polley $3 million for Polley's resignation from XNC and his twenty-one million shares, among other things.  *Id.* at 5.

At the time the Separation Documents were signed, XNC had over 100 stock holders who paid between one and two dollars per share of XNC.  *See* Transcript of Hearing (Tr.), taken April 18, 2014, at 37.[6]  On April 16, 2008, the XNC BOD approved a reorganization plan whereby all shareholders were offered the opportunity to exchange their shares in XNC for shares of Xurex.[7] (Doc. 84) at 3.  The reorganization plan contemplated that XNC's business would thereafter be

---

[6] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[7] Neither XNC nor Xurex exchanged the twenty-one million XNC shares previously owned by Polley for Xurex shares.  (Tr.) at 40.

conducted primarily through Xurex.  *Id.*  The same day the XNC BOD approved the

reorganization plan, XNC sent its shareholders an Exchange Offer Memorandum stating, in part:

> [XNC] will continue to have indebtedness following the Reorganization.  In February 2008, in connection with the departure of [XNC's] former CEO, [XNC] redeemed all of the stock held by the CEO in [XNC] for a purchase price of $3,000,000, of which $200,000 was paid at closing and $2,800,000 (plus interest at 4% per annum) will be paid over ten years. …  [XNC's] obligation to make these [] payments will adversely affect [XNC's] cash flows and may accelerate the need for additional financing.  In addition, the payment of the redemption price is secured by all of the redeemed stock, which represented approximately 33.6% of [XNC] outstanding stock immediately before the redemption.  If [XNC] defaults in the payment of this obligation, then [Xurex] will be adversely affected, since [XNC] will be a subsidiary of [Xurex] after the Reorganization.

(Doc. 35-1) at 13-14.

On July 1, 2008, when the first payment was due upon the Promissory Note and

continuing through the payment due on July 1, 2009, Xurex made each of the required payments

upon the Promissory Note.  (Doc. 1) at 3.  Xurex, however, failed to make the payment due upon

the Promissory Note for October 1, 2009, and has failed to make every payment thereafter.  *Id.*

On June 17, 2011, Polley wrote Xurex making a demand for payment for all amounts due and

owing upon the Promissory Note.  *Id.*  Xurex did not meet Plaintiffs' demand, so Plaintiffs filed

this lawsuit.

 *2. The Separation Documents*

  *a.  The Separation Agreement (Doc. 35-3) at 5 - 15*

Polley and Bishop, as XNC president and on behalf of XNC, signed the Separation

Agreement on February 22, 2008.  Pursuant to the terms of the Separation Agreement, Polley

was to resign as an employee and director of XNC and relinquish his twenty-one million XNC

shares, all in exchange for $3 million.  *Id.* at 5.  XNC was to pay the $3 million as follows: an

initial payment of $200,000, followed by quarterly installments of $70,000.  *Id.* at 1.  XNC's

obligation to pay the outstanding portion of the $3 million was the subject of the Promissory Note. *Id.* As security for the payment on the Promissory Note, XNC and Polley were required to place Polley's twenty-one million XNC shares into escrow pursuant to the Escrow Agreement. *Id.* at 2.

The Separation Agreement also contains five "Restrictive Covenants as to Polley." *Id.* at 10-11. Pursuant to the restrictive covenants, Polley agreed not to: (1) disclose any of XNC's confidential information; (2) compete with XNC for two years; (3) hire or attempt to hire any XNC employee or XNC independent contractor for two years; (4) solicit or encourage any person, firm, corporation, or other business who are customers of XNC to cease doing business, to not start doing business, or to decrease their level of business with XNC; and (5) disparage XNC. *Id.*

Additionally, the Separation Agreement contains releases of claims by XNC and by Polley. *Id.* at 6 - 8. Polley released XNC "from any and all claims, demands, rights, actions, suits, proceedings, liabilities, obligations and causes of action of any kind and nature whatsoever." *Id.* at 6. XNC released Polley from all claims of any kind and nature whatsoever, known or unknown, "that the Company had, now has or hereafter may possibly have based on, … acts or omissions to act of any nature and kind whatsoever … that occurred … prior to the Effective Date of this Agreement." *Id.*

The February 28, 2008, Separation Agreement and the January 11, 2008, Proposed Separation Agreement are substantively the same except for the addition of the release of claims by XNC. The portions that remain essentially unchanged include: Polley's termination of employment; the purchase price and payment schedule for Polley's twenty-one million XNC shares; the release of all claims by Polley; and the eight restrictive covenants as to Polley.

### b. The Promissory Note (Doc. 1-1)

Pursuant to the Separation Agreement, on February 22, 2008, Polley and Bishop, as president and on behalf of XNC, signed the Promissory Note. The Promissory note was executed in the principal sum of $2.8 million. The first payment on the Promissory Note was due on July 1, 2008, in the amount of $70,000.00 plus accrued interest. *Id.* at 1. Beginning on October 1, 2008, and continuing on the first business day of each quarter thereafter, XNC agreed to pay thirty-nine equal quarterly payments of $84,880.05. *Id.* The Promissory Note contains an acceleration clause providing that Polley may declare the amount due payable in full if, among other things, XNC failed to pay any amount when due or within five days after the payment date. *Id.* The Promissory Note states that the laws of Florida shall govern its interpretation and enforcement. *Id.* at 2.

### c. The Escrow Agreement (Doc. 50-3)

Under the terms of the Escrow Agreement, on February 28, 2008, Polley and XNC placed Polley's twenty-one million XNC shares in escrow with the law firm of Foley & Lardner as escrow agents. Foley & Lardner is still holding Polley's XNC shares in escrow. (Doc. 58-2).

## II. Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to

come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant.  *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted).  The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

*III. Discussion*

Plaintiffs assert that (1) the Separation Agreement and Promissory Note were properly executed and are enforceable; and (2) the terms of the Separation Agreement and Promissory Note bar Xurex's First, Fifth, and Sixth Affirmative Defenses and Counterclaim Counts III and IV.  Xurex initially responds by arguing that the Court should deny Plaintiffs' motion because: (1) Xurex is not properly a party to this suit; and (2) the transactions leading to the execution of the Separation Agreement and Promissory Note were not fair to XNC and, therefore, violate Fla. Stat. Ann. Section 607.0821.  The Court will address Xurex's preliminary arguments.

Regarding Xurex's argument that it is not properly a party to this suit, Xurex contends that XNC, not it, signed the Separation Agreement and Promissory Note and that Xurex has not agreed to assume or pay the amount stated in the Promissory Note.  This argument is duplicative of Xurex's arguments in its Motion for Summary Judgment, in which Xurex argued that it was not liable for actions of its predecessor corporation, XNC.  *See* (Doc. 34).  The Court denied, without prejudice, Xurex's Motion for Summary Judgment because Xurex failed to carry its initial burden of demonstrating a *prima facie* case of entitlement to judgment as a matter of

Florida successor liability law.[8] (Doc. 85).  Xurex has not filed a subsequent motion for summary judgment on successor liability and has not addressed Florida's successor liability laws in its response to Plaintiffs' Supplemental Motion for Summary Judgment.  Therefore, Xurex again has failed to adequately argue that it is not liable for XNC's obligations.  Consequently, the Court will proceed as though Xurex is properly a party to this suit.

Regarding Xurex's argument that the Separation Agreement and Promissory Note are void or voidable pursuant to Section 607.0821, this argument is duplicative of Xurex's argument in its Second Motion for Summary Judgment.  *See* (Doc. 68).  On June 25, 2014, the Court denied Xurex's Second Motion for Summary Judgment and held that Xurex was not entitled to summary judgment pursuant to Section 607.0821.  *See* (Doc. 102).  For the same reasons, the Court rejects this argument herein.  The Court now will address Plaintiffs' arguments that the Separation Agreement and Promissory Note are enforceable and certain affirmative defenses and counterclaims are barred by the terms of these documents.

A.  *Whether the Separation Agreement is enforceable*

Plaintiffs argue that the Separation Agreement and Promissory Note are enforceable because: (1) XNC properly issued Polley's XNC shares; (2) Polley gave consideration for the Separation Agreement and Promissory Note; (3) Bishop was not under duress when he signed the Separation Documents; (4) Bishop executed the Separation Agreement and Promissory Note with authority; and, (5) even if the Separation Agreement and Promissory Note were unenforceable when executed,  Xurex subsequently ratified them.

---

[8] Under Florida law, a successor business may be liable for the debts of its predecessor if: "(1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor."  *Amjad Munim, M.D., P.A. v. Azar*, 648 So.2d 145, 151 (Fla. 4th Dist. App. 1994) (citation omitted).

### 1.   *Whether XNC properly issued Polley his XNC shares*

In its Fifth Affirmative Defense, Xurex contends that the XNC BOD did not properly

issue Polley's twenty-one million XNC shares.  Additionally, Xurex's Sixth Affirmative Defense

contends that "Polley conveyed nothing of value to XNC" in return for his XNC shares, and "the

Board of Directors of XNC never valued any conveyance of consideration by Polley to XNC"

for his shares.  *Id.* at 6-7.  As such, Xurex contends that Polley's shares are void pursuant to

Section 607.0621, which requires the board of directors to determine that the consideration

received or to be received is adequate before the issuance of shares, and provides:

Issuance of shares

…

> (2) The board of directors may authorize shares to be issued for consideration
> consisting of any tangible or intangible property or benefit to the corporation,
> including cash, promissory notes, services performed, promises to perform
> services evidenced by a written contract, or other securities of the corporation.

> (3)  Before the corporation issues shares, the board of directors must determine
> that the consideration received or to be received for shares to be issued is
> adequate. That determination by the board of directors is conclusive insofar as
> the adequacy of consideration for the issuance of shares relates to whether the
> shares are validly issued, fully paid, and nonassessable. …

*See also Jacob v. Bernatek*, 764 So. 2d 874, 877 (Fla. Dist. Ct. App. 2000).  Section 607.0622(1)

addresses remedies when the consideration is determined not to be adequate after shares are

already issued, providing that, "[a] holder of … shares of a corporation shall be under no

obligation to the corporation … with respect to such shares other than the obligation to pay to the

corporation the full consideration for which such shares were issued or to be issued."

Based on the abovementioned statutes, Xurex argues that Polley's shares were not validly

issued under Section 607.0621 because (1) the XNC BOD never determined that the

consideration received from Polley for his shares was adequate; (2) if Polley's consideration for

12

his shares was a promise to perform services, it was not evidenced by a written contract.  Further, Xurex contends that Polley's shares are not valid under Section 607.0622(1) because Polley did not provide the full consideration for which his shares were issued, relying on testimony from Gimvang which states that Polley

> actually gave nothing for his stock.  Mr. Polley was supposed to provide future services to XNC for the stock, but he never did what he said he would do.  He was paid a salary and otherwise compensated, but the fundraising and other activities which he promised to perform and for which I agreed he should get stock were never done by him.

(Doc. 56) at 3.

Plaintiffs respond by relying on *Jacob* to correctly argue that "if a contract consideration requirement is not met, the corporation's remedy is to require the shareholder to provide the consideration for which the shares were issued."  (Doc. 94) at 6.  As such, Plaintiffs argue that Polley provided all the services he and Gimvang agreed he would provide in return for his shares.  Plaintiffs additionally argue that "[i]f Polley's shares were not validly issued and thus worthless, then so too are those of all other shareholders.  Yet all shareholders, except Polley, were allowed to exchange their XNC shares for Xurex shares and neither XNC nor Xurex ever claimed their shares were invalid."  (Doc. 94) at 6-7.

The evidence, viewed in a light favorable to Xurex, shows that, at the time the XNC BOD issued Polley's XNC shares, the XNC BOD did not make a written determination that the consideration received or to be received for Polley's shares was adequate.  Moreover, if Polley's consideration for his shares was a promise to perform services, his promise was not evidenced by a written contract.  Indeed, Gimvang testified that Polley did not perform the promised services that were allegedly consideration for his shares.  Based on this evidence, a reasonable jury could

conclude that XNC's issuance of Polley's stock did not meet the requirements of Section 607.0621.

Finally, a reasonable jury could not find the fact that Xurex exchanged all XNC shares besides Polley's to Xurex shares proves that XNC properly issued Polley's shares. Xurex, therefore, has put forth evidence that raises a genuine issue of material fact regarding whether XNC properly issued Polley his shares. Consequently, Plaintiffs are not entitled to summary judgment on the portions of Xurex's Fifth and Sixth Affirmative Defenses concerning lack of consideration for Polley's shares.

> 2. *Whether Polley provided adequate consideration for the Separation Agreement and Promissory Note*

In its First and Second Affirmative Defenses and portions of its Fifth and Seventh Affirmative Defenses, Xurex argues that the Separation Agreement and Promissory Note are unenforceable because Polley gave no consideration for them. For there to be an enforceable contract, there must be consideration. *W. Const., Inc. v. Florida Blacktop, Inc.*, 88 So. 3d 301, 304 (Fla. Dist. Ct. App. 2012). Consideration "may be generally thought of as the thing or the promise one party gives to the other party in return for the thing or promise that the other party gives." *Bayshore Royal Co. v. Doran Jason Co. of Tampa, Inc.*, 480 So.2d 651, 652 (Fla. Dist. Ct. App. 1985). Furthermore, consideration

> may consist of either a benefit to the promisor or a detriment to the promisee.... It is, however, sufficient if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do. A contract may be supported by any detriment or inconvenience, however small, sustained by one party, if it is by the express or implied consent of the other party.

*Id.* at 656; *see also Cintas Corp. No. 2 v. Schwalier*, 901 So.2d 307, 309 (Fla. 1st DCA 2005) ("A promise, no matter how slight, qualifies as consideration if the promisor agrees to do

something that he or she is not already obligated to do."). "It is not the province of a court to relieve one party of its contractual obligation on the basis of a judicial determination" as to the sufficiency of consideration given for an obligation. *Id.* at 656. Further, "[m]ere inadequacy of consideration is not a sufficient cause for rescinding or canceling a contract unless the inadequacy is so gross as to afford proof of actual fraud or unless the inadequacy is accompanied by other circumstances, such as weakness of mind or the like." *Id.*

Plaintiffs argue that Polley gave more than adequate consideration for the Separation Agreement and Promissory Note, including that he agreed to (1) relinquish his claim to twenty-one million XNC shares; (2) end his employment at XNC; (3) release XNC from all claims and actions of any kind, (4) not compete with XNC for two years; and (5) not solicit XNC's employees or customers. Xurex responds by arguing that many of the promised actions by Polley were meaningless because (1) Polley's shares were not validly issued; (2) he was subject to removal from his position by the shareholders at any time under the XNC By-Laws; and (3) Polley has not identified any claims he had against XNC which would be released. Xurex argues, therefore, the only remaining agreements that could serve as consideration are Polley's promise not to compete with XNC and not to solicit XNC's employees and customers, "which begs the question whether those agreements are adequate consideration for the $3 million Polley was to receive from XNC." (Doc. 93) at 24.

The Court agrees with Plaintiffs and finds that, viewing the evidence in a light most favorable to Xurex, a reasonable jury could find that Polley agreed to do things that he was not already obligated to do, namely giving up his XNC shares, resigning, complying with the restrictive covenants, and releasing XNC from potential claims. These promises, no matter how slight, provide adequate consideration under Florida law for the Separation Agreement and

15

Promissory Note.  Accordingly, Plaintiffs are entitled to summary judgment on Xurex's First and Second Affirmative Defenses, as well as the portion of Xurex's Fifth and Seventh Affirmative Defense involving Polley's lack of consideration for the Separation Agreement and Promissory Note.  Thus, the Court will dismiss these affirmative defenses with prejudice.

     *3.   Whether Bishop signed the Separation Documents under duress*

In Xurex's Third Affirmative Defense and portions of Xurex's Fifth and Seventh Affirmative Defenses, Xurex maintains that the Separation Agreement and Promissory Note are unenforceable because Bishop executed them under duress.  Duress is a defense to the enforceability of a contract.  *See ManorCare Health Servs., Inc. v. Stiehl*, 22 So.3d 96, 99 (Fla. 2d DCA 2009).  Duress "is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition."  *Parra de Rey v. Rey*, 114 So. 3d 371, 387 (Fla. Dist. Ct. App. 2013) (citation omitted).  Two factors must be proven to establish duress: "(a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side."  *Id.*  Establishing duress is "extremely difficult."  *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 503 (S.D. Fla. 2000).  It is well established that "it is not duress to institute or threaten to institute civil suits, or take proceedings in court, or for any person to declare that he intends to use the courts wherein to insist upon what he believes to be his legal rights." *Spillers v. Five Points Guaranty Bank*, 335 So. 2d 851, 852-53 (Fla. Dist. Ct. App. 1976).  "Duress would only occur when the threatened enforcement is to enforce rights which in fact are nonexistent." *Id.*

16

Plaintiffs argue that Bishop did not sign the Separation Agreement and Promissory Note under duress because Polley's alleged threats did not rise to the level of duress.  Plaintiffs contend that Bishop and XNC always had the choice whether to sign the Separation Agreement and Promissory Note, but they wanted to sign the documents to acquire Polley's shares, obtain Polley's resignation, and obtain a release of all claims against XNC in order to proceed with its reorganization plan.  Additionally, Plaintiffs argue that XNC's own attorney drafted the Proposed Separation Agreement that listed the $3 million figure and payment terms.  Xurex responds by arguing that the evidence establishes that Polley procured the Separation Agreement and Promissory Note by making threats against XNC, including threatening to sue XNC, take XNC technology offshore, and kill XNC's reorganization plan.  Xurex contends that Polley's threats gave Bishop no choice but to sign the documents.

The evidence, viewed in a light most favorable to Xurex, establishes that Polley threatened to sue XNC, take XNC's technology "off-shore," or generally to destroy the company.  Nothing in the record, however, demonstrates that the actions threatened by Polley were illegal or improper.  Additionally, the evidence shows that, on January 11, 2008, Creely, XNC's attorney, began the negotiations to get rid of Polley by sending Polley the Proposed Separation Agreement containing the $3 million proposed buyout.  Both parties to the Separation Documents were represented by counsel, Polley by Schwartz and XNC by Creely.  For the next six weeks, Creely and Schwartz negotiated terms of the Separation Documents.  Except for the addition of the release of claims by XNC, the parties made only minor changes between the Proposed Separation Agreement and the final Separation Agreement.  Importantly, the following parts of the Separation Agreement remained substantially unchanged from the Proposed Separation Agreement: Polley's termination of employment; the purchase price and payment

schedule for Polley's twenty-one million XNC shares; the release of all claims by Polley; and the eight restrictive covenants as to Polley.  XNC was eager for Polley to sign the Separation Documents to proceed with their reorganizational plans.  On February 22, 2008, Polley and Bishop, on behalf of XNC, signed the Separation Documents.

Xurex has not shown that a reasonable jury could find that Bishop, on behalf of XNC, entered into the Separation Documents involuntarily and not as an exercise of free choice or will, or, alternatively, if Bishop signed the Separation Documents involuntarily, that the involuntariness was caused by some improper or coercive behavior by Polley.  Polley's threats against XNC do not constitute duress because the record is devoid of evidence that his threatened litigation was nonexistent or his threats to take the technology "off-shore" were illegal or improper.  Additionally, Xurex cannot show that XNC had no other reasonable course of action than signing the Separation Documents.  Among the alternative courses of action available, XNC could have refused to sign the Separation Agreement and Promissory Note, filed an action preventing Polley from taking XNC's technology "off-shore," or chosen to fight any legal proceedings brought by Polley.  Likewise, XNC could have offered less money or a more favorable separation agreement.  Because these alternatives were reasonable and XNC was free to pursue them, XNC cannot establish duress.  *See Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 503 (S.D. Fla. 2000) (defendant could not establish duress because "she cannot show that there was no other reasonable course of action other than signing the [contracts], nor can she show that her will to refuse to enter into the agreements was overcome.").  Xurex, therefore, has failed to show that Bishop, on behalf of XNC, entered into the Separation Documents under duress.  Accordingly, Plaintiffs are entitled to summary judgment on Xurex's Third Affirmative

Defense and the portions of Xurex's Fifth and Seventh Affirmative Defenses concerning Bishop

entering the Separation Documents under duress.

> ### 4.   Whether Bishop was authorized to sign the Separation Documents

Xurex's Fifth and Seventh Affirmative Defenses assert, in part, that, at the time Bishop,

as XNC president, signed the Separation Documents, Polley knew that Bishop did not have the

authority to sign the Separation Documents and Bishop did not receive the authority from the

XNC BOD to execute the Separation Documents.  (Doc. 27) at 4, 9.  Xurex argues that the XNC

BOD did not authorize Bishop to sign the Separation Documents and relies on 18B Am. Jur. 2d,

*Corporations* § 1337 (2004), which provides:

> Generally, the office of president in itself confers no power on the party holding
> that office to bind the corporation.  Under this view, a corporate president's
> authority to bind the corporation is dependent on either the organic law of the
> corporation, such as the corporate bylaws, the delegation of either express or
> implied authority from the board of directors, or implied from a habit or custom
> of doing business.

Xurex contends that (1) XNC's By-Laws only allowed for Bishop, XNC's president, to enter into

the Separation Documents on behalf of XNC with approval from the XNC BOD, and Bishop

never received such approval; and (2) the record "is devoid of evidence that Bishop had such

authorization based on a habit or custom of doing business."  (Doc. 93) at 25.  Plaintiffs reply

that "[i]t was the habit and custom of XNC to allow its president to sign documents without

board approval."  (Doc. 94) at 10.  Plaintiffs point to five examples that, they argue, show that

"XNC rarely followed these By-laws and frequently recognized the enforceability of documents

when signed by an officer of XNC without board approval."[9] (Doc.77) at 14.

---

[9] Plaintiffs' examples of actions by XNC officers that bound XNC, but were not authorized by
the XNC BOD, include: Bishop's Employment Contract, executed by Kennedy as
secretary/treasurer; the January 2, 2008, phone call by Bishop, Gimvang, and Kennedy informing
Polley that he no longer was part of XNC; a March 8, 2008, XNC BOD meeting which added

The evidence, viewed in a light favorable to Xurex, shows that the XNC By-Laws only permitted XNC's president to execute documents in XNC's name "when authorized."  It is undisputed that the XNC BOD did not authorize Bishop, XNC's president, to enter into the Separation Agreement and Promissory Note.  There were, however, five instances when an XNC officer bound XNC without the XNC BOD's authorization, hardly a basis for a habit or custom of doing business.  Based on this evidence, a reasonable jury could conclude that Bishop did not have the authority to sign the Separation Agreement and Promissory Note.  Xurex, therefore, has put forth evidence that raises a genuine issue of material fact regarding whether Bishop had the authority to sign the Separation Documents.  Consequently, Plaintiffs are not entitled to summary judgment on the portions of Xurex's Fifth and Seventh Affirmative Defenses arguing that Bishop did not have the authority to sign the Separation Documents and did not receive the authority from the XNC BOD to execute the Separation Documents.

### 5.  *Whether Xurex ratified the Separation Documents*

Plaintiffs argue that, if Bishop were not authorized to sign the Separation Documents, Xurex ratified the Separation Agreement and Promissory Note thereby making Xurex liable for the Separation Agreement and Promissory Note.  Under Florida law, if (1) "a corporation takes and retains the benefits of an unauthorized act or contract on its behalf by an officer or agent," and (2) "has full knowledge of all of the material facts relating to the act or contract," then "it thereby ratifies and becomes bound by such act or contract, together with all the liabilities and burdens resulting therefrom."  *Luria v. Bank of Coral Gables*, 106 Fla. 175, 194, 142 So. 901, 908 (1932); *see also Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306,

---

Douglas Holt as a board member; the Escrow Agreement, signed by Bishop as XNC president; and, XNC's assignment of Bishop's Employment Contract to Xurex, executed by Bishop as XNC president.  *See* (Doc. 78).

313 (Fla. 2000) (party's right to rescind "is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission.").  A corporation "may become liable on a contract made prior to the existence of the corporation if it subsequently ratifies or adopts the contract either expressly or by implication."  *C. & H. Contractors, Inc. v. McKee*, 177 So. 2d 851, 853 (Fla. Dist. Ct. App. 1965).

Plaintiffs argue that Xurex received numerous benefits from the Separation Documents that were required for the reorganization plan, including acquiring Polley's XNC shares, resignation, and release of XNC from all claims and actions of any kind.  Additionally, Plaintiffs contend that Xurex, prior to Bishop's execution of Separation Agreement and Promissory Note, knew about possible problems with Polley's shares, the alleged duress, and that the XNC BOD did not hold a board meeting to approve Bishop's execution of the Separation Agreements.  Yet for over four years, Xurex did not seek to void the Separation Agreement and Promissory Note and, in fact, performed on those documents until October, 2009.

Xurex responds that it did not ratify the Separation Agreement and Promissory Note because (1) the Xurex Board of Directors could not have authorized the execution of the Separation Agreement because it was not a corporation on February 22, 2008, (2) Plaintiffs ignore the express language in the Exchange Offer Memorandum denying that Xurex would be liable for the Separation Agreement and Promissory Note, and (3) its voluntary payments on behalf of XNC did not constitute an assumption of the debt purportedly created by the Separation Agreement and did not in any way obligate Xurex to Plaintiffs.

Defendants' arguments are unpersuasive for several reasons.  First, Xurex could ratify the Separation Agreement and Promissory Note even though Xurex was not formed until after

February 22, 2008.  Defendants rely on *Flight Equip. & Eng'g Corp. v. Shelton*[10], to argue that Xurex Board of Directors could not have authorized the execution of the Separation Agreement because it did not exist on February 22, 2008.  In *Flight Equip.*, the plaintiff claimed that the defendant corporation ratified a $10,000 bonus which was illegal under Florida regulations.  *Id.* at 621.  The Florida Supreme Court stated that, "[i]t cannot be disputed that a board of directors of a corporation is without power to ratify that which it cannot do directly or that which it could not authorize be done initially. It has no power to ratify a void or illegal act."  *Id.*  In contrast, Defendants do not argue that the Separation Agreement and Promissory Note are illegal but rather that Xurex could not ratify them because they were entered into by its predecessor corporation, XNC.  Under Florida law, a corporation may ratify pre-incorporation contracts.  *See C. & H. Contractors, Inc.* 177 So. 2d at 853; *Meyer v. Nator Holding Co.*, 102 Fla. 689, 692-93 (1931) ("The rule appears to be general that after a corporation comes into being, it may make the contracts and agreements of its promoters its own by express agreement or by ratification or adoption.").

Second, the language in the Exchange Offer Memorandum does not expressly deny that Xurex would be liable for the Separation Agreement and Promissory Note.  To the contrary, language in the Exchange Offer Memorandum implies that Xurex will be liable for the contracts.  *See* (Doc. 35-1) at 14 ("If [XNC] defaults in the payment of this obligation, then [Xurex] will be adversely affected, since [XNC] will be a subsidiary of [Xurex] after the Reorganization.").  Additionally, there is not a subjective component to ratification; even if a corporation does not intend to ratify a contract, but retains the benefits of the contract after knowing of possible grounds to rescind, it is bound by that contract.

---

[10] 103 So. 2d 615 (Fla. 1958).

Finally, Xurex's voluntary payments on behalf of XNC constitutes ratification.  Viewing the evidence in a light most favorable to Xurex shows that Bishop did not have the authority to sign the Separation Documents on behalf for XNC.  Additionally, the Xurex Board of Directors, including Bishop as president and Gimvang as executive vice-president, knew the details of the Separation Agreement and Promissory Note and the potential grounds for rescission.  Finally, Xurex retained the benefits of Bishop's unauthorized act of signing the Separation Agreement and Promissory Note.  Based on this evidence, a reasonable jury would conclude that the Xurex Board of Directors ratified the Separation Agreement and Promissory Note.  Therefore, Xurex became bound by the Separation Agreement and Promissory Note.  Consequently, Plaintiffs are entitled to summary judgment based on ratification of the portions of Xurex's Fifth and Seventh Affirmative Defenses arguing that Bishop did not have the authority to sign the Separation Documents and did not receive the authority from the XNC BOD to execute the Separation Documents.

B.  *Whether Xurex's First, Fifth, and Sixth Affirmative Defenses, and Counterclaim Counts III and IV are barred by terms of the Separation Agreement*

Xurex's First, Fifth, and Sixth Affirmative Defenses contend that Polley gave nothing of value for his shares, and thus XNC did not validly issue those shares.  Plaintiffs argue that XNC had knowledge of potential problems with Polley's XNC shares and still signed the Separation Agreement, which forever and unconditionally released Polley from all claims of any kind whatsoever.  Therefore, Plaintiffs contend that the Separation Agreement's release of claims bars Xurex's First, Fifth, and Sixth Affirmative Defenses.

Counterclaim Count III alleges that "[w]hile Chairman of the Board of Directors, member of the Board of Directors, Chief Executive Officer, President and Treasurer, Polley embezzled funds from XNC."  (Doc. 27) at 10.  Counterclaim Count IV requests the Court to

23

award Xurex punitive damages because Polley's issuance of shares to himself in 2005, his alleged threats, and his embezzlement were all done intentionally, willfully, wantonly and without regard for XNC or its shareholders.  Likewise, Plaintiffs argue that, under the Separation Agreement's release of claims, XNC released Polley from punitive damages as well as all other types of damages by absolutely, irrevocably, and unconditionally releasing Polley forever from "all claims, demands, rights, actions, suits, proceedings, liabilities, obligations and causes of action of any kind and nature whatsoever."  Hence, Plaintiffs conclude that the release under the Separation Agreement bars Counterclaim Counts III and IV.

As discussed above, Bishop did not sign the Separation Agreement and Promissory note under duress, and, although genuine issues of material facts exist regarding whether Bishop had the authority to sign the Separation Documents, Xurex subsequently ratified them.  Therefore, a reasonable jury would conclude that the Separation Agreement and Promissory Note are enforceable and genuine issues of material fact do not exist to their enforceability.  Clearly, under the Separation Agreement, XNC released Polley from all claims and causes of action, including Counterclaim Counts III and IV.  However, affirmative defenses are distinct from claims and causes of action and, therefore, the express terms of the Separation Agreement do not bar Xurex's First, Fifth, and Sixth Affirmative Defenses.  *See Haven Fed. Sav. & Loan Ass'n v. Kirian*, 579 So. 2d 730, 733 (Fla. 1991) ("[C]ounterclaims and affirmative defenses are separate and distinct terms.  A counterclaim is a cause of action that seeks affirmative relief, while an affirmative defense defeats the plaintiff's cause of action by a denial or confession and avoidance.").  Consequently, a reasonable jury could conclude that the Separation Agreement only bars Xurex's Counterclaim Counts III and IV.  Hence, Plaintiffs are entitled to summary judgment on these counterclaims.

IT IS ORDERED that Plaintiffs' Supplemental Motion for Summary Judgment (Doc. 87) is granted, in part, in that:

1. the Court will grant summary judgment in favor of Plaintiffs on Xurex's First Affirmative Defense, Second Affirmative  Defense, and Third Affirmative Defense;

2. the Court will grant summary judgment in favor of Plaintiffs on the portions of Xurex's Fifth Affirmative Defense concerning lack of consideration for the Separation Agreement and Promissory Note and concerning Bishop entering the Separation Documents under duress;

3. the Court will grant summary judgment in favor of Plaintiffs on the portions of Xurex's Fifth and Seventh Affirmative Defenses arguing that Bishop did not have the authority to sign the Separation Documents and did not receive the authority from the XNC BOD to execute the Separation Documents;

4. the Court will grant summary judgment in favor of Plaintiffs on the portions of Xurex's Seventh Affirmative Defense concerning lack of consideration for the Separation Agreement and Promissory Note and concerning Bishop entering the Separation Documents under duress; and

5. the Court will grant summary judgment in favor of Plaintiff on Xurex's Counterclaim Counts III and IV.

UNITED STATES DISTRICT JUDGE